Filed 12/20/13  Saafir v. City of Los Angeles CA2/1

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| KARIM SAAFIR, | B233271 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. BC389434) |
| v. | |
| CITY OF LOS ANGELES et al, | |
| Defendants and Respondents. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Debre Katz Weintraub, Judge.  Reversed with directions.

Wesierski & Zurek, Frank J. D'Oro, Brian J. Stack and Nathaniel Clark for Plaintiff and Appellant.

Carmen A. Trutanich, City Attorney, Blithe S. Bock and Amy Jo Field, Deputy City Attorneys, for Defendants and Respondents.

_____

## SUMMARY

As he was being escorted from a meeting at which he had just been informed he would be terminated, appellant Karim Saafir, a probationary Los Angeles Police Department officer was involved in a hallway scuffle with a sergeant assigned to escort him from the building. Saafir sued the sergeant and the City of Los Angeles, among others, for various causes of action related to what Saafir alleged was an unlawful use of force. On appeal following a jury verdict in favor of defendants, Saafir contends that: (1) There is insufficient evidence to support the defense verdict; (2) The jury was erroneously instructed as to the burden of proof on the claim for battery; and (3) The court erred, following *Pitchess*[2] proceedings, in failing to order disclosure of an investigatory report of the hallway skirmish and witness statements used to prepare the report.

Saafir's first two contentions are meritless, but the third has merit. Accordingly, we will remand the case to the trial court with directions to turn over the discoverable information and to provide Saafir an opportunity to demonstrate a reasonable probability the information would have led to relevant, admissible evidence he could have presented at trial that would have resulted in a different outcome at trial had the evidence been disclosed.

## FACTUAL BACKGROUND

In December 2007, Saafir was a probationary LAPD officer. By his own admission, Saafir was a "poor officer, demonstrating an inability to master even basic procedures such as following directions (he would get lost) or write reports. He . . . constantly expose[d] himself to danger by walking up to suspects or into danger zones before cleared [sic] or secured." On December 20, 2007, the 29th day of his 30-day probationary period, Saafir was summoned to an afternoon meeting at the Wilshire Division (station). The meeting was conducted by Lieutenant Synthia Lee (Lee). Respondent Sergeant Michael Ventura (Ventura), and Sergeant Rudy Hernandez (Hernandez) also participated. Notwithstanding his admittedly poor performance, Saafir was surprised to learn that the meeting was his exit interview. At that

---

[2] *Pitchess v. Superior Court* (1974) 11 Cal.3d 531 (*Pitchess*).

meeting Lee told Saafir that, due to his unsatisfactory performance, he would be discharged, and he had the option to sign a resignation form or a form initiating his termination. Saafir refused to sign either document.

Upset by Lee's announcement, Saafir became increasingly emotional as the meeting progressed. He cried profusely and pleaded for "another chance," or "another few days." Lee described Saafir as "very loud," "upset, angry, not very happy." He was argumentative and intermittently aggressive. Lee and Ventura described Saafir as irrational during the meeting: he banged his fists on the table, saying things like, "you guys don't understand." Lee repeatedly asked Saafir to stop yelling and to calm down. Lee testified that Saafir "was crying. I handed him tissue . . . and I just tried to calm the situation. [¶] . . . [¶] I told him a couple of times to calm down. I even gave him the opportunity for a few minutes just to sit and cry."

Saafir denied having banged his fists on the table or making any threatening gestures during the meeting with Lee. He conceded that he had cried uncontrollably and begged for another chance and more time. After Saafir refused to sign any form, Lee advised him the meeting was over and directed Ventura and Hernandez to escort him out of the station. During the interview, Saafir had disclosed that his service weapon was in his locker, which was upstairs. Lee refused to allow Saafir to go upstairs to his locker to retrieve his personal effects, and told him to follow Ventura and Hernandez out the back door. As everyone stood to leave, Lee asked Saafir for his police I.D. Saafir took the I.D. from his wallet but held it close to his chest, refusing to hand it over even after Lee asked for it repeatedly. Saafir finally loosened his grip on the I.D. and Lee took it from his hands.

As the exit interview ended, Ventura stepped over the threshold of the office into the hallway. Saafir walked toward the door and stood five to six inches in front of Ventura. Saafir appeared angry and "placed both his fists up towards his chest and just continued to stare at Sgt. Ventura." Concerned about Saafir's behavior and that the situation was drawing attention from around the station, Lee summoned everyone back into the office to continue the meeting in private, and explained to Saafir that she "wasn't trying to embarrass him." After about 30 or 40 minutes, Lee felt comfortable ending the interview and Ventura and Hernandez began escorting Saafir from the building. The men walked single file through a narrow hallway that

3

intersects in a "T" formation with a wider hallway near the north end of the station. Ventura led the way, followed by Saafir and Hernandez.

We digress briefly to focus on the physical layout of relevant areas of the station. Basic familiarity with that layout is necessary in order to understand the principal factual matters in dispute.[3] Saafir's exit interview was conducted in a captain's office, located near the center of the station on a relatively narrow north/south hallway. At its north end, that hallway meets an east/west hallway at a "T-intersection."

The east/west hallway varies in width, but appears to be about twice as wide as the north/south hallway to the west (left, facing north) of the T-intersection and also for a short distance east (right) of the T-intersection. Across the hall from the T-intersection, immediately to the east (right) is a men's restroom. East of the door to the men's restroom is a stairway that leads to the men's locker room on the second floor. Directly across from the T-intersection is a room labeled "Elect. Room." Immediately west of the electrical room is a "kit room," where officers check out and return equipment. On the south wall directly across from the kit room, immediately west (left) of the T-intersection, is a cabinet containing shelves for candy and other items. A large room, identified at trial as the detectives' room, is located at the far west end of the east/west hallway. One door of the detectives' room opens onto the hallway in front of the kit room, facing the stairs some distance away. Along the north-west side of the kit room another hallway leads to the rear exit door and parking lot to which Ventura and Hernandez attempted to escort Saafir. Two video security cameras are mounted near the T-intersection. One camera (the kit room camera) covers some of the area in front of the kit

_____

[3] Notwithstanding the pivotal importance of what happened and where it happened, neither side made an effort to create a useful record regarding the dimensions of the areas involved, or the actual distance between any area, object or landmark about which testimony was offered. The only marginally useful pieces of evidence at trial were a line diagram of the station identifying some areas involved, some video evidence, and a diagram drawn by Hernandez. We rely primarily on the diagrams—but do not know whether either is drawn to scale—to piece together where the relevant areas and landmarks are located in relation to one another.

4

room and hall leading to the rear exit. The other (DUI) camera, films an area facing east down the east/west hallway, beginning somewhere near the door to the men's restroom, and just to the right of the T-intersection.

Ventura testified that he emerged first from the north/south hallway, followed by Saafir and Hernandez. He crossed the T-intersection and turned or veered left (west), headed for the rear exit door. Saafir was supposed to but did not follow him. Instead, both Ventura and Hernandez saw Saafir "veer[] slightly to the right." Both men were concerned that Saafir might head upstairs to his locker where he might be able to retrieve his "duty weapon."[4] Hernandez grabbed Saafir's left arm. Ventura positioned himself in front of the staircase and grabbed Saafir's right arm. Ventura did not mean to "take [Saafir] down" when he grabbed his arm. His purpose was to "accomplish the mission, . . . '[and] just get him outside.'" But, according to both Ventura and Hernandez, Saafir immediately resisted, struggled and pulled his arms forward, causing all three men to topple to the ground.[5]

Officer David Cordova was at his desk when he heard yelling in the hallway. He turned his chair around and saw that Ventura and Hernandez "had an individual, holding him on each arm, one on each arm." That person, whom Cordova later learned was Saafir, had his head down and appeared to be struggling. Cordova leapt from his chair to help Ventura and Hernandez as Saafir struggled to break out of their grip. Cordova secured Saafir's right arm while another officer (Brookshire) handcuffed him. Both Cordova and Brookshire were at desks in the detectives' room when they first saw the incident.

---

[4] During the exit interview, Saafir was not asked if he was armed. It was later discovered that Saafir had worn an off-duty weapon in an ankle holster from the outset.

[5] Saafir recounted a different version of what occurred after the meeting. He said Ventura immediately gripped his left arm as everyone stood to leave the office, and maintained a tight grip as he led Saafir down the hall. As they neared the T-intersection, Saafir asked Ventura if he could go to his locker to get some personal items. Without provocation, Ventura "sudden[ly]" and "unexpected[ly]" forced Saafir to the ground next to the candy shelf across from the kit room.

Respondent Lieutenant Nicholas Barbara was in the restroom by the stairs when he heard a commotion. He emerged to see a "dog pile" of men on the ground—Saafir, Ventura and Hernandez. Saafir was in handcuffs and a gun had been removed from his ankle holster. As the highest ranking officer present, Barbara assumed command and separated the individuals involved. At first, based on what he heard from Lee, Ventura and Hernandez, Barbara believed Saafir had violated Penal Code section 148 (resisting, delaying or obstructing a police officer engaged in the performance of his or her duties). Saafir was handcuffed and taken to a room where he remained under guard for seven hours. The handcuffs were removed after about two hours. At the outset Barbara felt it was necessary to keep Saafir in handcuffs because he had been involved in a physical altercation with two sergeants, remained highly emotional and it was customary to keep a detainee handcuffed until a decision was made about whether to charge a detainee with a crime. While in the room, Saafir was allowed to visit with his wife and mother and was evaluated by an LAPD psychologist. After Saafir met with the psychologist, Barbara decided Saafir had calmed down sufficiently and regained enough self-control that it was safe to remove the handcuffs.

Saafir was never formally detained or arrested, nor was any report made regarding his detention. Saafir was told only that he was detained for "insubordination" and for "being emotional." After discussing the matter with Lee and his supervisor, Barbara decided not to initiate formal arrest proceedings against Saafir. At 11:00 p.m., Saafir was given an overtime slip to sign, his personal weapon was returned to him and he was released. Saafir was terminated from the LAPD.

Pursuant to LAPD policy, Barbara called in a supervisor from another division to conduct the use of force investigation. Sergeant Juan Reyes (Reyes) was assigned as the investigating officer. Ventura and Hernandez each exercised his right to retain counsel and did not provide statements to Reyes. Reyes took statements on December 20 from nine people, including Cordova and Brookshire.

Video from the kit room camera does not show Ventura turning left at the T-intersection. That video captures only a few seconds of the hallway scuffle. Ventura and Barbara each testified that the kit room camera would not have captured Ventura's image as he

6

turned left at the T-intersection, because the area into which Ventura turned is in one of that camera's blind spots. Barbara testified that the DUI camera is also not situated in an area in which its lens could have captured Ventura's movements. At the request of counsel, Barbara drew markings at trial on a copy of the station diagram to depict generally the area within the range of the kit room and DUI cameras. (Ex. 201A.)

Ventura prepared the first of several versions of his "Employee Use of Force Report, Form 15.07" (15.07 Report) about two weeks after the incident.[6] He said he consulted with Hernandez before preparing his 15.07 Report. Hernandez denied having discussed or having reviewed Ventura's 15.07 Report before it was turned in. In the 15.07 Report, Ventura said he feared Saafir might engage in workplace violence based on his conduct during the exit interview. The 15.07 Report states that, during that meeting, Saafir "was disassociate" and "his eyes were bulging," he put his hands in Hernandez's face, chest bumped Ventura and the knuckles on Saafir's hands turned "white."

Testimony by Cordova and Brookshire regarding what they observed largely mirrored Ventura's recounting of events in the 15.07 Report. Cordova was at his desk in the detective's room when he heard a disturbance. He turned to look behind him and saw Saafir struggling to get away from Ventura and Hernandez, who gripped or were trying to grip his arms. Cordova jumped from his chair to help the sergeants. Brookshire testified that he was in the detectives' room with an unobstructed hallway view through the door before he went to assist the other officers.

---

[6] Initially, the City claimed Ventura's original 15.07 Report had been lost. The City produced the original 15.07 Report shortly before Reyes's deposition was taken in January 2011. The various versions of the 15.07 Report differ in ways not at issue here.

## PROCEDURAL BACKGROUND

Saafir filed this action in April 2008 against respondents City of Los Angeles (LAPD), Ventura and Barbara, among others, alleging, as pertinent here, clams for battery, false imprisonment, and violation of the Bane Civil Rights Act (Civ. Code, § 52.1).[7]

After lengthy discovery disputes, a jury trial was conducted in February 2011, resulting in a unanimous defense verdict. Judgment was entered on March 10, 2011. Saafir filed this appeal after his motions seeking review of discovery rulings and a new trial were denied.

## DISCUSSION

Saafir maintains that: (1) there is insufficient evidence to support the verdict in favor of respondents; (2) erroneous jury instructions improperly shifted to him the burden to prove that the degree of force Ventura used was unreasonable; and (3) the trial court's failure to order full disclosure of Reyes's Use of Force Report and some witness statements used in the preparation of that report unfairly inhibited his ability to present his case and to cross-examine witnesses.

1.      *The verdict is supported by substantial evidence.*

Testimony by respondents' witnesses aligned completely with Ventura's recitation of what transpired as he and Hernandez tried to escort Saafir out of the station. But Saafir claims the kit room video is "the one piece of objective evidence that proves the entire defense false . . . [b]ecause Sgt. Ventura is not in the video." Saafir insists he has proved that Ventura's version of events was objectively false and that respondents' witnesses intentionally falsified their testimony, and the judgment in favor of Ventura on the battery claim must be reversed. Saafir is mistaken.

---

[7] This was the second trial in this case. The first trial ended in a mistrial after the jury was unable to reach a verdict. By the time of this trial, the only remaining defendants were the LAPD, Ventura and Barbara, each of whom is a respondent. Saafir initially sued the LAPD and Ventura for Assault and Battery, Discrimination in Violation of the Ralph Civil Rights Act (Civ. Code, §§ 51.7, 52), and the Bane Act, and negligence. He sued the LAPD and Barbara for False Imprisonment. Only the battery, false imprisonment and Bane Act claims were tried.

*a.     Standard of review*

We review a challenge to a jury's verdict according to the substantial evidence standard.  (*Holmes v. Lerner* (1999) 74 Cal.App.4th 442, 445.)  Substantial evidence means evidence "'of ponderable legal significance . . . reasonable in nature, credible and of solid value.'  [Citations.]"  (*Bowers v. Bernards* (1984) 150 Cal.App.3d 870, 873, italics omitted.)  This is a stringent standard, and an appellant "raising a claim of insufficiency of the evidence assumes a 'daunting burden.'"  (*Whiteley v. Philip Morris, Inc*. (2004) 117 Cal.App.4th 635, 678.)

"We review the evidence in the light most favorable to the respondent, resolve all evidentiary conflicts in favor of the prevailing party and indulge all reasonable inferences possible to uphold the . . . verdict.  [Citation.]"  (*US Ecology, Inc. v. State of California* (2005) 129 Cal.App.4th 887, 908.)  "[W]e do not evaluate the credibility of the witnesses or otherwise reweigh the evidence.  [Citation.]"  (*Escamilla v. Department of Corrections & Rehabilitation* (2006) 141 Cal.App.4th 498, 514–515.)  The testimony of a single credible witness, even a party himself, may constitute "substantial" evidence.  (*City and County of San Francisco v. Givens* (2000) 85 Cal.App.4th 51, 56.)  A factfinder may reject uncontradicted evidence it finds not credible.  (*Ortzman v. Van Der Waal* (1952) 114 Cal.App.2d 167, 171.)

*b.     Analysis*

Saafir insists respondents' witnesses were thoroughly impeached and there is insufficient credible evidence to support the jury's verdict.  He maintains a myopic focus on the fact that the kit room video did not capture Ventura's image before the hallway scuffle or show him making the left turn he claims to have made after he passed the threshold at the T-intersection and headed toward the back door.  Instead, the video shows only snippets of a skirmish in the hallway near the kit room.  Because the video does not reveal the path Ventura traveled, Saafir maintains Ventura must have lied when he claimed that Saafir turned right when he veered left, causing Ventura to believe he needed to move back and block Saafir's path up the stairs.

Barbara and Ventura each explained for the jury how Ventura's description of the course he followed after turning left at the T-intersection was consistent with the fact that his

9

image had not been captured on either the kit room or DUI video. Ventura testified that the area into which he turned as he headed toward the exit was not within the range of either camera. And Barbara testified: "I believe I've already explained to you where [Ventura] is. And I told you. He's out of the view of the camera, as is [Saafir], as is [Hernandez], as is the candy cabinet, which is further down the wall than this camera depicts."

The fact that the video did not capture an image of Ventura turning left as he headed toward the rear exit does not present the extraordinary circumstance in which reversal of a unanimous jury verdict premised on witness credibility is in order. Nothing about the video justifies disregarding the testimony by Ventura and Hernandez that Ventura did in fact make that turn. The jury viewed the video. The jury credited Ventura's testimony that he turned left after the T-intersection, but moved back when he noticed Saafir heading for the stairs. The jury also credited Ventura's and Hernandez's testimony that they grabbed Saafir by the arms to stop him from going upstairs, and that Saafir resisted their efforts by pulling forward with his arms, causing them to tumble to the ground. Nothing in the video renders Ventura's testimony (or that of any other witness) so "inherently implausible" or "physically impossible" as to justify disregarding the testimony under the substantial evidence rule. The jurors rejected Saafir's assertion that Ventura lied, and were not persuaded by the video that events did not unfold the way Ventura and Hernandez claimed they did. The "substantial evidence" standard of review does not permit us to second-guess the jury's factual findings.

Based on the diagrammatic and video evidence and testimony at trial, it is entirely possible that the hallway in front of the kit room is, as Ventura and Barbara claim, fully wide enough for Ventura to have veered left after crossing the threshold, only to stop and turn back to head off Saafir on the right without showing up on the film. Saafir offered no evidence to rebut the testimony that the field of view of the lenses of the kit room and DUI cameras was any different than Barbara and Ventura claimed it was. Apart from his own unsubstantiated self-serving version of events, Saafir offered the jury no reason to disbelieve that Ventura did what he said he did, and that his movements simply were not captured on film.

Apart from inviting us to disregard the jury's resolution of credibility and conflicting evidentiary issues, Saafir offers nothing to substantiate his claim that there is insufficient

10

evidence to support the judgment on the battery claim. Viewing the evidence, as we must, in the light most favorable to the jury's verdict, we conclude that substantial evidence supports the jury's conclusion that Ventura did not engage in an unreasonable use of force. (*Scott v. Pacific Gas & Electric Co.* (1995) 11 Cal.4th 454, 465.) Accordingly, the judgment in favor of Ventura on the battery claim is affirmed.[8]

2.      *No instructional error occurred.*

On the cause of action for assault and battery, the language of the instruction given to the jury precisely tracks the standard instruction for a claim of Battery by a Police Officer (CACI No. 1305).[9] In an argument advanced for the first time on appeal, Saafir argues that the

---

[8] Saafir raises no challenge on appeal either to the jury's verdict in favor of Ventura on the Bane Act claim, or in favor of Barbara on the false imprisonment claim.

[9] Specifically, the jury was instructed:
"Karim Saafir claims that Michael Ventura harmed him by using unreasonable force to overcome his resistance. To establish this claim, Karim Saafir must prove all of the following:
"1.      That Michael Ventura intentionally touched Karim Saafir;
"2.      That Michael Ventura used unreasonable force to overcome the resistance of Karim Saafir;
"3.      That Karim Saafir did not consent to the use of that force;
"4.      That Karim Saafir was harmed; and
"5.      That Michael Ventura's use of unreasonable force was a substantial factor in causing Karim Saafir's harm.
"A police officer may use reasonable force to arrest or detain a person when he or she has reasonable cause to believe that that person has committed a crime. Even if the police officer is mistaken, a person being arrested or detained has a duty not to use force to resist the police officer unless the police officer is using unreasonable force.
In deciding whether Michael Ventura used unreasonable force, you must determine the amount of force that would have appeared reasonable to a police officer in Michael Ventura's position with his specialized training under the same or similar circumstances. You should consider, among other factors, the following:
"(a) The seriousness of the crime at issue;
"(b) Whether Karim Saafir reasonably appeared to pose an immediate threat to the safety of Michael Ventura or others; and
"(c) Whether Karim Saafir was actively resisting arrest or attempting to evade arrest.

11

trial court erred by giving this instruction because it incorrectly applies a burden of proof applicable to battery by a police officer against an ordinary citizen. Specifically, he insists now that the instruction improperly forced him to shoulder the burden of proving that Ventura's use of force was unreasonable, even though Ventura was not acting in his official capacity as a police officer at the time the battery occurred. Saafir argues this was nothing more than a "workplace violence incident having nothing to do with 'police work.' That no arrest or detention occurred. Therefore, the applicable law and jury instructions are those dealing with traditional assault and battery [CACI 1300]." We reject this contention.

The issue of the capacity in which Ventura was acting when the alleged assault occurred was put to rest by the parties' stipulation that his actions were undertaken "in the course and scope of [his] employment with the [LAPD] . . . ." Having agreed that Ventura's actions were performed in the course of his duties as a police officer, Saafir may not now assert that Ventura was not acting in that capacity.

Second, Saafir did not object at trial on the theory he now asserts. "The failure to object to an instruction relieves an appellate court of the obligation to review claimed error therein." (*Wilkinson v. Bay Shore Lumber Co.* (1986) 182 Cal.App.3d 594, 599; *Miller v. Kennedy* (1987) 196 Cal.App.3d 141, 147; cf., *Carrau v. Marvin Lumber & Cedar Co.* (2001) 93 Cal.App.4th 281, 297 [failure to object to an instruction that is "'incomplete or too general'" forfeits the issue on appeal].)[10] The record reflects that Saafir took issue with CACI 1305 *only* to the extent that he argued that the preamble which states, "Karim Saafir claims that Michael

---

"A police officer who makes or attempts to make an arrest is not required to retreat or cease from his or her efforts because of the resistance or threatened resistance of the person being arrested."

[10] Saafir's assertion that he is not estopped from raising a new ground for instructional error because he sought an instruction for traditional battery borders on the disingenuous. Saafir did initially propose a traditional battery instruction (CACI 1300). However, for reasons not explained in the record, Saafir abandoned that instruction by the time the court conducted its February 16, 2011 conference regarding disputed instructions. At that conference, Saafir argued only about the language to be used to instruct on a claim of "Battery by a Police Officer, 1305." Further, Saafir has never before raised the objection he asserts here.

Ventura harmed him by using unreasonable force *to overcome his resistance*[,]" should state instead that "Karim Saafir claims that Michael Ventura harmed him by using unreasonable force *against him.*"**11** (Italics added.)

Third, on these facts CACI 1305 is the appropriate instruction. In a battery action against a police officer, the plaintiff must prove unreasonable force as part of his affirmative claim. (*Edson v. City of Anaheim* (1998) 63 Cal.App.4th 1269, 1272 (*Edson*); see also *Yount v. City of Sacramento* (2008) 43 Cal.4th 885, 902 [citing *Edson* with approval; common law battery claim against police officer requires proof that officer used unreasonable force.].) "Unlike private citizens, police officers act under color of law to protect the public interest. They are charged with acting affirmatively and using force as part of their duties, because 'the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it.' [Citation.] They are, in short, not similarly situated to the ordinary battery defendant and need not be treated the same." (*Edson*, at p. 1273.) Saafir insists *Edson* does not apply because he was not formally detained or arrested, and the rule of *Edson* is inapplicable in a case involving workplace violence between fellow police officers. We see no reason to depart from *Edson*.

The record reflects that Ventura gripped an irrational, emotionally volatile and about-to-be-fired Saafir to block his access to the stairs leading to his locker and gun. Ventura had been ordered by his superior to escort Saafir from the station and was performing an official duty. Ventura was charged with acting affirmatively and using force as part of those duties. (*Graham v. Connor* (1989) 490 U.S. 386, 396 [109 S.Ct. 1865, 104 L.Ed.2d 443].) The court did not err in instructing the jury that Saafir had the burden of proof on the issue of unreasonable force.

An officer, charged with the duty to protect public peace and order, is entitled to use even greater force than might in the same circumstances be required for a person engaged in

---

**11** Saafir also argued CACI 1305's second element of proof should read: "Michael Ventura used unreasonable force *against* Karim Saafir," rather than ". . . *to overcome the resistance of* Karim Saafir." (Italics added.)

self-defense. (*Edson*, *supra*, 63 Cal.App.4th at p. 1273.) "Placing the burden of proof on the plaintiff gives the police appropriate maneuvering room in which to make such judgments free from the need to justify every action in a court of law." (*Ibid*.) The record contains sufficient evidence to indicate that Ventura acted in his official capacity as a police officer in attempting to escort Saafir from the station, and that his efforts to block Saafir from what he believed could be an effort to access his firearm were done to protect the public. (*Ibid*.) It does not matter if Saafir thought Ventura acted as a police officer or a co-worker when he grabbed his arm. The evidence shows—and Saafir stipulated—that everything Ventura did was done in his capacity as an LAPD officer.

And, contrary to Saafir's assertion, the instruction does not require the jury to assume Saafir resisted arrest or committed a detainable or arrest-worthy offense. It presented those issues as fact questions for the jury to resolve. Jurors were told that: "[i]n deciding whether [Ventura] used unreasonable force," [they] should consider, among other things, whether "Saafir reasonably appeared to pose an immediate threat to the safety of" Ventura, and whether "Saafir was actively resisting or attempting to evade arrest." The instruction left it to the jury to decide if Saafir resisted Ventura's efforts to keep him from mounting the stairs in order to access his weapon.

This was not a close case in terms of evidence. But it was one that required the jury to choose between two markedly different versions of an incident. By its unanimous verdict the jury flatly rejected Saafir's story. The jury believed that Ventura and Hernandez gripped Saafir's arms to stop him from heading upstairs because they feared he was, or might be, headed for a weapon. They believed Saafir resisted those legitimate efforts and tried to wrest himself away from the officers, causing himself and them to topple to the ground in that effort. That Saafir ultimately was not charged with a crime is of no moment. The question of whether a police officer defendant had a reasonable suspicion is decided by viewing circumstances at

14

the time of the detention, not the result of any charges brought against the plaintiff or dismissed. (See *Johnson v. Lewis* (2004) 120 Cal.App.4th 443, 456.)[12]

3.      *Pitchess motions*

Saafir contends the trial court and discovery referee's refusal to order complete disclosure of the "internal Use of Force Report" and related witness statements used to prepare that report prevented him from having a fair trial by prejudicing his ability adequately to prepare for trial and to examine witnesses. He insists we remand the case with orders to review the undisclosed documents to determine whether a third trial is in order.

a.      *The first Pitchess motion*

Discovery in this case traveled a circuitous path poorly marked by signs bearing confusing and indistinct verbiage, which gave rise to a confounding muddle. We begin by tracing that route to decipher its markers.

In June 2010, Saafir filed a motion to compel production of (1) "The personnel records of [Ventura]," including documents responsive to 14 specific issues, and (2) "The internal investigation report of the subject incident that occurred on December 20, 2007."[13]

The LAPD vigorously opposed the *Pitchess* motion. It argued that Saafir's requests were overbroad, and that the requested personnel records were privileged and protected from disclosure by Ventura's right of privacy. (Pen. Code, § 832.7.) The LAPD also asserted that, although some records might be discoverable, Saafir failed to satisfy the first hurdle under the *Pitchess* framework, i.e., he had not shown good cause to justify an in camera review for the court to determine the relevance of the documents to matters at issue.

---

[12] Our conclusion that the jury was properly instructed renders moot Saafir's assertion that the jury's finding on the claim of false imprisonment was tainted by the court's erroneous instruction on the battery claim.

[13] This was Saafir's second motion to compel, and virtually identical to a motion to compel he filed in April 2010. The LAPD's opposition to the April 2010 motion was granted on procedural grounds for Saafir's failure to comply with the service requirements of the *Pitchess* process. We refer to motions to compel as *Pitchess* motions.

The trial court granted Saafir's *Pitchess* motion, in part. The court agreed to conduct an in camera review of the following information:

"a) Disciplinary or other records involving altercations or confrontations involving [Ventura] with fellow members of the [LAPD];

"b) Disciplinary or other records involving false or misleading statements made by [Ventura];

"c) Documents evidencing the number of exit interviews [Ventura] has conducted as a member of the LAPD;

"d) Complaints of excessive force and physical abuse made against [Ventura] since joining the LAPD;

"e) Complaints of verbal abuse and 'inappropriate conduct' made against [Ventura] since joining the LAPD;

"f) Documents evidencing the reason why [Ventura] was allegedly transferred to the location where he was assigned on the date of the incident involving [Saafir];

"g) The internal investigation report of the subject incident that occurred on December 20, 2007."

With respect to personnel complaints, the court limited its review to complaints within five years preceding December 20, 2007. It also observed that, if any disclosures were made, only complainants' and witnesses' names, addresses and phone numbers would be disclosed, subject to a protective order. The court's in camera review took place over the course of three sessions on July 19, August 18 and August 27, 2010. The trial court later referred additional *Pitchess* proceedings to a discovery referee agreed upon by the parties, the Hon. Victor H. Person (ret.) (referee).**14**

---

**14** The appellate record contained no sealed transcript for any in camera *Pitchess* sessions. On our own motion, we ordered the trial court to augment the record to include those transcripts, and the record of further proceedings conducted by the referee to reflect evidence he considered when ruling on any *Pitchess* motion between November 1, 2010 and the end of January 2011. Pursuant to our order to do so, the trial court augmented the record with sealed transcripts of its oral proceedings on July 19, August 18 and August 27, 2010, and an unsealed

### (i) July 19, 2010 in camera review

At the first in camera session on July 19, 2010, Robert Briceno, the LAPD's custodian of records, produced multiple complaints regarding Ventura. The trial court found that 15 complaints contained relevant material and ordered them turned over to Saafir. With regard to the final category of documents sought in the *Pitchess* motion, Briceno advised the court that the investigation of the complaint involving Saafir remained open, but he "had a copy of the [one page] use of force report."[15] The court ordered that turned over. Ultimately, it became clear to the court that, although the *Pitchess* motion sought an "internal investigation report" of the incident involving Saafir, the LAPD had produced only a part of that report for the in camera hearing. The court refused to rule in a piecemeal fashion, and Briceno was ordered to return for a further hearing on August 18 with the "full report." No documents were turned over on July 18.

### (ii) August 18, 2010 in camera review

The LAPD produced two "binders" of documents at the August 18, 2010 continued *Pitchess* hearing. Deputy City Attorney Kelly Kades and Briceno told the trial court those binders constituted "the entire file that exists on this case that was generated as a response to the internal affairs complaint." The binders contained the "Use of Force Report" produced for the court on July 19, 2010 and additional materials. But neither Kades nor Briceno was able to tell the court whether disclosure of anything in the file might endanger the health or safety of an LAPD officer or other person, and the court required that information to balance the interests at stake.

---

February 26, 2013, "Report of Discovery Referee Concerning Materials Considered During *Pitchess* Motion," conducted on December 6, 2010, and an unsealed "Supplemental Report of Discovery Referee Concerning Materials Considered During *Pitchess* Motion."

[15] In mid-July, the LAPD moved to quash Saafir's subpoena duces tecum (SDT) seeking Reyes's "Use of Force Report" regarding the December 20, 2007 incident involving Saafir, and all recordings and transcripts made, and witness statements Reyes took, while investigating that incident. The trial court granted the motion without prejudice in August 2010.

Following the in camera session, the parties returned to open court where the court signed a protective order and the LAPD turned over unspecified information the court had ordered disclosed on July 19. The court advised Saafir's counsel that the "internal investigation report" requested in his *Pitchess* motion did not exist, as such. The court reiterated that there was "no report that's been finalized with respect to this. There are backup documents that will be part of and be used for the report." The court acknowledged that Saafir's SDT and the LAPD's motion to quash, on which it had recently ruled, had addressed "matters dealing with the backup information . . . [that] will comprise the report." But the court observed that it was obligated strictly to comply with the rules regarding *Pitchess* motions. The trial court urged the parties to try informally to resolve the discrepancy between Saafir's specific request for a finalized internal investigation report in the *Pitchess* motion, and the preparatory backup materials the LAPD produced for the court's review and which were encompassed within the subpoena. The parties were unable to reach an agreement, and a third session in camera session was set.

### (iii) *August 27, 2010 in camera review*

Briceno, Kades and the LAPD's trial attorney appeared for the third *Pitchess* hearing, as did two internal affairs investigators who had (serially) handled the investigation of the December 20, 2007 incident involving Ventura. Both investigators told the court they were unaware of anything in the investigative materials that would physically endanger anyone.

After completing its in camera review, the court again advised the parties in open court that no "final . . . investigative report with respect to this matter" existed, as had been specifically requested in the *Pitchess* motion. The court reiterated that it was bound to comply with strict legal requirements when ruling on a *Pitchess* motion. Saafir's *Pitchess* motion sought only a final report, not the underlying investigatory materials. Thus, because there "[was] no report, . . . nothing [had] to be turned over." The trial court advised Saafir to file a new *Pitchess* motion seeking the underlying investigatory materials.

18

b.    *The second Pitchess motion*

(i)    *Discovery referee*

On September 15, 2010, Saafir filed a second *Pitchess* motion. He framed his request to seek production of the "Use of Force Report prepared by Officer [Reyes] immediately following the subject incident that occurred on December 20, 2007[,]" and "[a]ny and all witness and officer statements conducted and/or used by Officer [Reyes] in the preparation of the above Use of Force Report."

The second *Pitchess* motion was argued in mid-October. The court found Saafir had "shown good cause for an *in camera* review of the Use of Force Report and the related statements used in preparation of the Report," and ordered that they be reviewed by a discovery referee. "Specifically, as to the statements, pursuant to Government Code section 3303(f)(3), the Referee [would] be provided the statements and any corresponding depositions," and "must compare the two to see if there [was] any impeachment material. If the Referee determines there is impeachment material, then the Referee shall disclose to [Saafir] only such statements (or portions of statements) that impeach the Officer's deposition testimony." [16]

The referee conducted an in camera review on December 6, 2010. No contemporaneous record or report was made of that proceeding. However, according to a report prepared pursuant to our February 4, 2013, order to augment the record, the referee reviewed transcripts of the depositions of Hernandez, Ventura and Lee, and compared those transcripts with 18 documents or categories of documents,[17] and an Internal Affairs file for one

---

[16] In mid-November, the trial court also ordered discovery reopened regarding any information disclosed pursuant to the *Pitchess* proceedings. The Court ruled that the referee would determine the permissible extent of discovery to be conducted, and whether Saafir could take Reyes's deposition as it related to his investigation and Use of Force Report. Reyes's deposition was taken. Saafir does not take issue with this ruling.

[17] Because Saafir's *Pitchess* motion sought "the Use of Force Report," the referee specifically asked the parties, in January 2011, "whether or not those [18] documents 'in totality' comprised the 'Use of Force Report.'" The referee never received a response to that

matter as to which some material had previously been disclosed. The referee ordered the LAPD "to turn over a total of four (4) pages of redacted versions of portions of the 'Use of Force Reports.'"

### (ii) Further augmentation

The record remained incomplete even after the submission of the referee's report. In July 2013, we directed the trial court, "to conduct anew an in camera hearing as to . . . Saafir's September 15, 2010 *Pitchess* motion, as to which the trial court found Saafir had 'shown good cause for an in camera review of the Use of Force Report and the related statements used in preparation of the Report.'" We further ordered that the court's review be conducted in conformance with the requirements of *People v. Mooc* (2001) 26 Cal.4th 1216, 1228–1231 (*Mooc*). In August, the trial court provided us with sealed transcripts of its in camera hearing, conducted over the course of four days in July and August 2013, all materials reviewed in the course of that hearing.

### c. Application

Under the statutory scheme enacted in the wake of *Pitchess* and its progeny, a party seeking discovery of confidential police officer personnel records follows a two-step process. (*People v. Gaines* (2009) 46 Cal.4th 172, 179 (*Gaines*); *Mooc*, *supra*, 26 Cal.4th at p. 1226.) First the party files a written motion describing the records sought, supported by affidavits setting forth the materiality of the information sought to the pending litigation, and a reasonable belief that the governmental agency has the records sought. (*Gaines*, at p. 179.) "This initial burden is a 'relatively relaxed standard . . . .' [Citation]" that serves to facilitate the production for the trial court's review, all potentially relevant documents. (*Haggerty v. Superior Court* (2004) 117 Cal.App.4th 1079, 1085–1086; *Gaines*, at p. 179.) Second, if good

---

question as of the date of his February 26, 2013 report prepared for this court. Instead, the referee was left to "speculate[], without having actual knowledge, that the materials received at the December 6 proceeding were the 'Use of Force' report." He therefore proceeded on the assumption that the 18 categories of documents, taken together, constituted "the Use of Force Report."

cause is shown, "the court must review the requested records in camera to determine what information, if any, should be disclosed. [Citation.] Subject to certain statutory exceptions and limitations [citations], 'the trial court should then disclose to the defendant "such information [that] is relevant to the subject matter involved in the pending litigation."' [Citations.]" (*Gaines*, at p. 179.)

Saafir challenges the second part of the court's determination. He complains that he was prejudiced and prevented from adequately preparing for trial and cross-examination because the trial court and referee refused to order disclosure of probative, discoverable portions of the LAPD's internal investigation report and unidentified witness statements.

The proper remedy when relevant information has erroneously been withheld is generally "a conditional reversal with directions to review the requested documents in chambers on remand." (*Gaines*, *supra*, 46 Cal.4th at p. 180; see also Pen. Code, § 1260 ["reviewing court may remand cause . . . for such further proceedings as may be just under the circumstances"].) Section 1260 evinces a "legislative concern with unnecessary retrials where something less drastic will do." (*People v. Vanbuskirk* (1976) 61 Cal.App.3d 395, 405.) "Similarly, when a trial court has failed to review the *Pitchess* documents at all, it is appropriate to remand the case to permit the trial court to review the requested documents in chambers and to issue a discovery order, if warranted. (*Gaines*, at pp. 180–181.) After reviewing the confidential materials in chambers, the trial court may determine that the requested records contain relevant information and should be disclosed.[18]

But, a court's determination that requested information ought to have been disclosed "is not the equivalent of a finding that such information would have had any effect on the outcome of the underlying court proceeding—nor, indeed, even a finding that such information would

---

[18] At oral argument the LAPD asserted that no conditional reversal is required here because Saafir forfeited his right to complain about erroneously withheld discovery when he stipulated to the truncated procedure employed by the discovery referee and failed to raise this issue prior to trial. The matters to which the LAPD refers are outside the appellate record; they will not be considered.

have been admissible, inasmuch as the trial court's duty to disclose encompasses information that is not itself admissible but which 'may lead to admissible evidence.' [Citation.]" (*Gaines*, *supra*, 46 Cal.4th at p. 182.) In *Gaines*, the California Supreme Court held that "the trial court's erroneous denial of a *Pitchess* motion is not reversible per se. Rather, the failure to disclose relevant information . . . , like other discovery errors, is reversible only if there is a reasonable probability of a different result had the information been disclosed." (*Id*. at pp. 180–184; see also *People v. Gonzalez* (2006) 38 Cal.4th 932, 960; *People v. Hustead* (1999) 74 Cal.App.4th 410, 421–422.)

Following its in camera hearing on August 1, 2013, the trial court concluded that certain materials were relevant and should have been disclosed to Saafir. We have reviewed the sealed record of the thorough *Pitchess* proceedings conducted by the trial court pursuant to our augmentation order. We concur with the trial court's assessment. Accordingly, the appropriate remedy is to remand the matter to the trial court with directions to turn over to Saafir the discoverable information identified at pages 17 through 23 of the sealed transcript of the August 1, 2013 in camera hearing, subject to an appropriate protective order. Saafir must then be given a reasonable opportunity to determine if the information would have led to any relevant, admissible evidence that he could have presented at trial. If Saafir can demonstrate he was prejudiced by the denial of the discovery, the trial court must order a new trial. However, in the event Saafir is unable to show any prejudice, then the judgment in favor of respondents is ordered reinstated, and the judgment is ordered affirmed. (See *People v. Moreno* (2011) 192 Cal.App.4th 692, 711–712; *Gaines*, *supra*, 46 Cal.4th at pp. 183–184.)

## DISPOSITION

The judgment is reversed and the matter remanded to the trial court with directions to turn over to Karim Saafir the discoverable information identified at pages 17 through 23 of the sealed transcript of the August 1, 2013 in camera hearing, subject to an appropriate protective order. The trial court shall give Karim Saafir a reasonable opportunity to determine whether the newly disclosed information would have led to any relevant, admissible evidence he could have presented at trial. In the event Karim Saafir can demonstrate he has been prejudiced by the denial of the discovery, the trial court must order a new trial. In the event Karim Saafir is unable to demonstrate prejudice as a result of the denial of discovery, the judgment in favor of respondents shall be reinstated. Each party shall bear its own costs on appeal.

NOT TO BE PUBLISHED.


JOHNSON, J.


We concur:


CHANEY, Acting P. J.


MILLER, J.[*]

_____

[*] Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.