[Nos. A091121, A091880. First Dist., Div. One. Oct. 26, 2001.]

ROBERT W. CARRAU et al., Plaintiffs and Appellants, v.
MARVIN LUMBER AND CEDAR COMPANY et al., Defendants and
Appellants.

**COUNSEL**

**COUNSEL**

Gibbons & Conley, Austin Gibbons and Sean C. Conley for Plaintiffs and Appellants.

Titchell, Maltzman, Mark & Ohleyer, James J. Ficenec; Winthrop & Weinstein and Donald J. Brown for Defendants and Appellants.

**OPINION**

**STEIN, Acting P. J.**—Sometime in the late 1980's, Robert W. Carrau purchased over 50 windows from Marvin Lumber and Cedar Company (Marvin), a window manufacturer, which were incorporated into a residence Carrau built for himself and his wife in Orinda, California. The windows proved to be defective, and, on October 17, 1997, Carrau filed suit against Marvin, seeking damages on the theories, as relevant here, of products liability, breach of express and implied warranties and violation of the Song-Beverly Consumer Warranty Act, Civil Code section 1790 et seq. (hereafter the Song-Beverly Act).

The trial court granted summary adjudication to Marvin on Carrau's theory of breach of implied warranty, finding Carrau's claims under that theory to be time-barred. The remaining claims were tried to a jury, which returned a verdict in favor of Carrau on his claim of breach of express warranty, awarding him $200, and on his claim of strict products liability, awarding him $350,000. The jury, however, returned a defense verdict on Carrau's claim of breach of the Song-Beverly Act.

Marvin appeals from the order of the trial court denying Marvin's motion for a new trial or for judgment notwithstanding the verdict, contending that the evidence does not support the verdict, and that Carrau's claim of breach of express warranty was time-barred. We agree, and will reverse the judgment. Carrau cross-appeals, contending that the jury was prejudicially misinstructed on the Song-Beverly Act. Although we find error in the instructions, we further find that Carrau waived the point by failing to submit qualifying instructions, and that in all events any claim he might have had under the act also was time-barred.

FACTS

After purchasing a 22-acre parcel of property in Orinda in the late 1980's, Carrau and his wife designed and built a residence described by Carrau as the "culmination of all [his] work." The residence, which included over 50 wood-framed windows supplied by Marvin, was completed in late 1990. It is undisputed that the windows had been treated with an ineffective preservative, with the result that they were subject to premature rotting.

Carrau first noticed a problem with the windows in 1993 or 1994, when he found it necessary to replace the sill on one window and learned that a second window was leaking. There was evidence that the leaking caused some interior Sheetrock to become wet and may have caused a stain on a carpet. Carrau repaired the window, and replaced some wallpaper that had been damaged by the leaking. There was evidence that Carrau also had to replace some exterior stucco.

Carrau did not at that time attribute the leaking and related problems to a defect in the windows. Sometime later, however, he learned that there was rot on the sash or frame of yet another window. At that point, Carrau contacted Marvin, which sent out a representative to survey all the windows. Following the survey, Marvin sent Carrau a letter, dated June 15, 1997, proposing to replace 26 of the windows, and asking Carrau to obtain bids for the work. Carrau obtained two bids, for $306,000 and $290,864, respectively, which included not only replacement of the windows themselves, but such things as landscaping removal and restoration, replastering, restoring interior faux painting finishes that would be damaged by the repairs, replacing moldings and replacing security systems. The bids were sent to Marvin, which responded by sending out its own contractor, who submitted a bid for $115,000, not including items such as removal and restoration of landscaping, that had been included in the bids obtained by Carrau. Carrau was not satisfied with the credentials of Marvin's contractor, and refused to permit that contractor to do the work unless Marvin agreed to guarantee that the residence would be perfectly restored.

In the meantime, Marvin had constructed and shipped the 26 windows. By this time, however, Carrau noticed that some additional windows, not covered by Marvin's proposal, were showing signs of deterioration. Carrau therefore sought bids to replace all of the windows. The two contractors originally contacted by him submitted bids for $479,510.33 and $439,003, respectively. A third contractor bid $298,596.13 for the replacement of the original 26 windows, plus $129,354.33 for the remaining windows.

Marvin refused to pay in accordance with the estimates obtained by Carrau, and refused to guarantee that the work, if done by its own contractor,

would restore the residence to a perfect condition. Marvin did, however, fabricate and deliver windows to replace all of Carrau's windows.[1]

Carrau never actually replaced the windows. He put the house on the market in 1997. A residential real estate appraiser specializing in unusual and high-end properties such as Carrau's home, stated her opinion that the property, in an undamaged condition, would have sold for as much as $5.75 million. Carrau listed it at $6 million. He ultimately sold the residence, however, for $5,250,000, and as a part of that sale, further agreed to credit the purchasers with $426,000 to cover the costs of installing the replacement windows.

The purchasers replaced only four of the windows and ten sills. Their contractor dug out any rot discovered on the remaining windows and put in an epoxy product. He then installed a two-piece molding assembly over the windows, which enabled him to do the repairs and replacements without disturbing the interior finishes, the exterior stucco or much of the landscaping. The contractor retextured some Sheetrock and treated the windows as necessary with Pentachloride, a wood preservative. The repairs cost approximately $100,000. There was evidence that of this price, the cost of the repairs to property other than to the windows themselves, such as the damage to the Sheetrock, was "in the neighborhood of a couple of hundred dollars."

THE APPEAL

I.

*Breach of Warranty*

The jury awarded Carrau $200 for breach of an express warranty, apparently concluding, that except for the damage to property other than the windows themselves, Marvin satisfied its warranty obligations by delivering the replacement windows. Marvin contends here, as it contended in moving for judgment notwithstanding the verdict, that the jury's finding of breach of warranty is not supported by substantial evidence. Marvin further contends that even if there is some evidence of breach of warranty, Carrau's suit on that theory was barred by the applicable statute of limitations. We agree.

Carrau did not produce any express warranty that accompanied the sale of the windows. It was, however, established that at all relevant times, Marvin

---

[1]We can find no testimony by any witness that Marvin in fact manufactured and delivered a full complement of replacement windows. The jury, however, was told by both attorneys that the windows were supplied, and no appellate issue concerns any lack of supporting evidence. We consider the matter no further.

sold its windows with a limited one-year warranty for millwork, and there was evidence that the windows at issue here were delivered with some kind of a warranty and had some type of quality assurance labels.[2] It is undisputed that no defect in the windows was discovered or reported until over one year had passed from the date of purchase. The standard one-year limited warranty, therefore, provides no support for the jury's verdict.

Carrau theorized, however, that it could be inferred that Marvin had provided Carrau with an express warranty guaranteeing that the windows would be free from defect for a period of 10 years. In support of this theory, Carrau produced evidence of a letter written to a homeowner by a customer service representative employed by Marvin, indicating that the company that provided the product used on the homeowner's windows "gives the finish for a 10-year life expectancy." A second letter, written to another homeowner, indicated that Marvin would write a 10-year warranty for a job with a minimum of 50 windows.[3] Carrau asserted that it was likely that Marvin had provided him, as a purchaser of more than 50 windows, with a 10-year warranty. Carrau pointed out that Marvin had not produced the exact warranty provided to Carrau, arguing that it could be inferred that Marvin had provided Carrau with a favorable warranty, which was then conveniently lost. Finally, Carrau pointed out that after he complained, Marvin offered to replace the windows, which action, according to Carrau, indicated an understanding that the windows were still under warranty although the one-year period in the standard warranty long had passed.

Marvin responded by asserting that it offered to replace the windows not because it had a legal obligation to do so, but as a courtesy to Carrau. When asked about the letters produced by Carrau, a witness—who had worked for many years as a customer service representative with Marvin—confirmed that Marvin might, at the time of sale, enter into an agreement to provide some service to a customer even after the one year warranty period had expired. Marvin would do so, however, only if the customer specifically requested it, and even then Marvin would not agree to replace its products. Rather, Marvin might agree to help the buyer with any claim the buyer might have against the manufacturer of a substance used on Marvin's products.

---

[2]Marvin's limited warranty provided, as relevant here, "Marvin millwork is warranted for one year after sale to be of high quality workmanship and materials and to be free from defects which might render it unserviceable. . . . [¶] For one year, we agree to repair or replace . . . without charge, any items which may be defective. The company, however, cannot under any conditions, be responsible for repainting, refinishing, or other similar activities necessary to complete the replacement." Marvin's witness explained that if a product was under warranty, Marvin would provide a replacement window at no charge, but it would be the customer's responsibility to pay for the labor to remove, install and refinish the window.

[3]These letters have not been made a part of the appellate record, but their subject matter can be determined from the testimony of the witness examined about them.

It is true that a judgment may be supported by inference. The inference, however, "must be a reasonable conclusion from the evidence and cannot be based upon suspicion, imagination, speculation, surmise, conjecture or guesswork. [Citation.]" (*Beck Development Co. v. Southern Pacific Transportation Co.* (1996) 44 Cal.App.4th 1160, 1204 [52 Cal.Rptr.2d 518].) Here, the fact that Marvin could produce no warranty issued to Carrau does not support an inference that Marvin provided Carrau with anything other than the standard one-year warranty. It was not Marvin's burden to prove that it did not write a special warranty for Carrau, but Carrau's burden to prove that such a warranty was in fact written. Carrau produced no evidence that he, or anyone working for him, requested a special warranty, and the undisputed evidence was that Marvin would provide special warranties only upon a customer's request.

Even if the jury reasonably could have inferred that Marvin had entered into some kind of special agreement with Carrau, there was no evidence from which it further might be inferred that Marvin agreed to warrant the windows to be free from defects for a period of 10 years. The evidence established no more than that Marvin might agree to help a purchaser with any claims against some other entity, such as the manufacture of the wood preservative, that had provided an extended warranty. There is no evidence whatsoever that Marvin offered or agreed to help Carrau with claims against the manufacturer of the wood preservative.

■ " ' "The scope of appellate review of a trial court's denial of a motion for judgment notwithstanding the verdict is to determine whether there is any substantial evidence, contradicted or uncontradicted, supporting the jury's conclusion and where so found, to uphold the trial court's denial of the motion." ' [Citation.]" (*Shapiro v. Prudential Property & Casualty Co.* (1997) 52 Cal.App.4th 722, 730 [60 Cal.Rptr.2d 698].) ■ Under the circumstances of this case, and on this record, it could be nothing more than speculation, surmise, conjecture or guesswork that Marvin entered into a special agreement to provide Carrau with a warranty that it had not provided to any other customer—i.e., to warrant the windows to be free from defects for a 10-year period. Substantial evidence, therefore, does not support any finding by the jury that Marvin entered into an agreement with Carrau to provide him with such a warranty.

■ Carrau's final theory was that Marvin's advertisements acted as an express warranty that its products were durable and long lasting. In support of this theory, Carrau introduced a number of the advertisements as exhibits. The advertisements made assertions such as that Marvin's windows would be "long-lasting," even "in the most challenging of climates," and would

provide the homeowner with an "investment that will stand him in good stead for years to come." Carrau also introduced evidence that Carrau, who himself is a contractor, was familiar with Marvin's advertisements and brochures, and was aware of Marvin's reputation as one of the finest manufacturers of wood windows, and a company that stood behind its product.

It is recognized that there are times when an assertion made in advertising, if read and relied upon by the purchaser, may act as a warranty. (See 1 White & Summers, Uniform Commercial Code (4th ed. 1995) § 9-5, pp. 491, 494-496; see also *Lane v. C. A. Swanson & Sons* (1955) 130 Cal.App.2d 210, 215 [278 P.2d 723].) We find, however, that we need not decide if the jury was entitled to conclude on the evidence that Marvin's advertisements amounted to an express warranty, because we find that Carrau's claim is barred by the applicable statute of limitations.

California Uniform Commercial Code section 2725, subdivision (1) provides that actions such as this "must be commenced within four years after the cause of action has accrued." Subdivision (2) provides: "A cause of action accrues when the breach occurs, regardless of the aggrieved party's lack of knowledge of the breach. A breach of warranty occurs when tender of delivery is made, except that where a warranty explicitly extends to future performance of the goods and discovery of the breach must await the time of such performance the cause of action accrues when the breach is or should have been discovered." It is undisputed that Carrau failed to file suit within four years of the delivery of the windows. The jury's verdict, therefore, can be sustained only if the exception stated in subdivision (2) applies; i.e., if it might be concluded that Marvin's warranty explicitly extended to future performance of the goods.

No California case has determined the scope of the "future performance" exception to California Uniform Commercial Code section 2725,[4] but it has been the subject of numerous decisions from other jurisdictions. A few courts have construed the exception broadly. In *Perry v. Augustine* (1965) 37 Pa. D. & C.2d 416, for example, cited by Carrau, a manufacturer of a heating

---

[4]The only California case that has provided any interpretation of the "future performance" exception appears to be *Krieger v. Nick Alexander Imports, Inc.* (1991) 234 Cal.App.3d 205 [285 Cal.Rptr. 717]. The court in that case found that the exception applied when a dealer promised to repair an automobile within 36 months of its purchase or during the first 36,000 miles of its use. The court then held that the four-year limitations period of Califonia Uniform Commercial Code section 2725 did not begin to run until the buyer reasonably knew that this promise would not be fulfilled. The question here, however, is not when the cause of action accrues within an extended warranty period, but whether Marvin's advertisements should be viewed as an agreement to provide an extended warranty *at all*.

system represented that the system would "be able to heat at 75 degrees inside at a -20 degrees outside temp." The court found that a breach of warranty could not occur until the weather outside had reached -20 degrees. *Insurance Co. of North America v. ABB Power Generation* (S.D.N.Y 1996) 925 F.Supp. 1053, also cited by Carrau, involved the installation and maintenance of a steam turbine facility, and an assertion by the seller that the facility would be capable of producing steam and electricity. The court, finding that the contract was in fact a service contract rather than a contract for the sale of goods, applied a general limitations statute to the transaction, concluding that under it, the buyer was required to file suit within six years of substantial completion of the installation. (*Id.* at pp. 1060-1061.) The court also found, in dicta and without analysis, that the future performance exception to section 2725 would apply because it would not be possible to determine whether the warranty had been breached until some time in the future. (*Insurance Co. of North America, supra,* at p. 1061.)

The vast majority of the courts that have considered the point, however, have concluded that the "future performance" exception to the four-year limitations period applies only when the seller explicitly has agreed to warrant its product for a defined period of time. These courts reason that California Uniform Commercial Code section 2725 reflects the drafters' intention to establish a reasonable period of time—four years—beyond which sellers need not worry about stale warranty claims. (*Standard Alliance Ind. v. Black Clawson Co.* (6th Cir. 1978) 587 F.2d 813, 820.) Nonetheless, "a buyer and a seller can freely negotiate to extend liability into the future . . . [but] an express warranty which makes no reference at all to any future date should not be allowed to extend past the limitations period. . . . [¶] [Thus, where] an express warranty is made which extends for a specific period of time, i. e., one year, the policy reasons behind strict application of the limitations period do not apply. If a seller expressly warrants a product for a specified number of years, it is clear that, by this action alone, he is explicitly warranting the future performance of the product or goods for that period of time." (*Id.* at pp. 820-821.)

Under this reasoning, general assertions as to the performance or durability of a product, such as the assertions made by Marvin in its advertisements, do not explicitly extend to future performance of the product. In *Cooper Power Systems v. Union Carbide* (7th Cir. 1997) 123 F.3d 675, 684, for example, it was held that an assertion that "vinyl paints maintain their good appearance for 'many years,' " does not amount to a warranty explicitly extending to future performance. In *Economy Housing Co. v. Continental Forest Products* (8th Cir. 1986) 805 F.2d 319, 320-321, the court held that there was no warranty explicitly extending to future performance in language that plywood is intended for permanent exterior exposure. In *Parrino*

*v. Sperling* (1996) 232 A.D.2d 618 [648 N.Y.S.2d 702, 703], the court found that a descriptive statement in an owners manual, asserting that a wheelchair would serve the buyer well for many years, does not rise to the level of a warranty that explicitly extends to the future performance of the goods. In *Jones & Laughlin Steel v. Johns-Manville Sales* (3d Cir. 1980) 626 F.2d 280, 290-291, the court concluded that no extended warranty arose from the seller's literature asserting that the seller had been producing roofing felts made of asbestos for over 100 years and could cite many asbestos roofs that have been performing "satisfactorily after more than forty (40) years of exposure to heat, cold, water, air and even fire. And, all of this service with minimum maintenance and repair costs." Many other cases have reached similar conclusions. (See Annot., What Constitutes Warranty Explicitly Extending to "Future Performance" for Purposes of UCC § 2-725(2) (2000) 81 A.L.R.5th 483, 529-550, § 5, and cases collected there.)

As noted in 1 White and Summers, Uniform Commercial Code, *supra*, section 11-9, page 608, "[I]t should be clear that this extension of the normal warranty period does not occur in the usual case, even though all warranties in a sense apply to the future performance of goods."[5] In accordance with this principle, and with the majority of cases that have adopted it, we hold that generalized assertions in advertisements and literature, such as those made in Marvin's advertisements, do not rise to the level of a warranty explicitly extending to future performance.

It follows that Marvin was entitled to judgment notwithstanding the verdict on Carrau's claim of breach of express warranty.

## II.

### *Strict Products Liability*

■ The jury awarded Carrau $350,000 on his theory of strict products liability, accepting his claim that this theory entitled him either to the cost of repairing and replacing the windows, or to the diminished value of the residence resulting from the defective windows. As we find that Carrau failed to produce evidence entitling him to recover either measure of damages on a claim of strict products liability, we will set aside the jury's verdict.

In seeking damages for strict products liability, Carrau sought a remedy under tort law. It is settled that tort law provides a remedy for construction

---

[5]The authors criticized *Perry v. Augustine, supra,* 37 Pa. D. & C.2d 416, finding unpersuasive the rationale that the warranty there was explicitly prospective because the discovery of a breach would have to await the future performance of the goods. The authors pointed out that the same could be said of all warranties. (1 White & Summers, Uniform Commercial Code, *supra,* § 11-9, p. 610.)

defects that cause property damage or personal injury, but, at least until the recent decision in *Aas v. Superior Court* (2000) 24 Cal.4th 627 [101 Cal.Rptr.2d 718, 12 P.3d 1125], the extent of tort remedies for construction defects has been uncertain. As that court noted, in connection with a claim for damages resulting from negligence in constructing a residence, "[a]ny construction defect can diminish the value of a house. But the difference between price paid and value received, and deviations from standards of quality that have not resulted in property damage or personal injury, are primarily the domain of contract and warranty law or the law of fraud, rather than of negligence. In actions for negligence, a manufacturer's liability is limited to damages for physical injuries; no recovery is allowed for economic loss alone." (*Id.* at p. 636.) After describing the evolution of the law of products liability or negligence in the area of construction defects, and surveying the cases, the court held that a plaintiff is not entitled to recover in tort for the costs of repairing and replacing a defective product; recovery for those costs is available only under contract or breach of warranty law. The court's summary of the case law, set forth at pages 640-641, is instructive.

"In *Zamora v. Shell Oil Co.* (1997) 55 Cal.App.4th 204, 208-211 [63 Cal.Rptr.2d 762], for example, homeowners were not allowed to recover in negligence or strict liability for the cost of replacing water pipes known to be defective, but which had not yet leaked. In *Fieldstone v. Briggs Plumbing Products, Inc.* (1997) 54 Cal.App.4th 357, 363-367 [62 Cal.Rptr.2d 701], a strict liability case, a general contractor was not awarded the cost of replacing installed sinks that rusted and chipped prematurely, because no other property had been damaged. In *San Francisco Unified School Dist. v. W.R. Grace & Co.* (1995) 37 Cal.App.4th 1318, 1327-1330 [44 Cal.Rptr.2d 305], a public school district could not state a cause of action in negligence or strict liability based on the presence of asbestos products in its buildings when the products had not contaminated the buildings by releasing friable asbestos. In *Sacramento Regional Transit Dist. v. Grumman Flxible* (1984) 158 Cal.App.3d 289, 293-298 [204 Cal.Rptr. 736], the court held a transportation district could not recover in negligence or strict liability for the cost of repairing defective bus parts that had not caused further damage. 'We believe,' the court explained, that 'the line between physical injury to property and economic loss reflects the line of demarcation between tort theory and contract theory.' (*Id.* at p. 294.) As one final example, significant because of its similarity to the case before us, the court in *Casey v. Overhead Door Corp.* [(1999)] 74 Cal.App.4th 112, 123-124 [87 Cal.Rptr.2d 603], a negligence case based on defective windows in mass-produced housing, relied on [*Seely v. White Motor Co.* (1965) 63 Cal.2d 9 [45 Cal.Rptr. 17, 403 P.2d 145]], to uphold an order excluding testimony about damages representing the cost to replace defective windows that had not caused property

damage and a nonsuit based on that order. 'A consumer,' the court explained, 'may not recover economic loss damages against the manufacturer of a defective product in a cause of action for strict liability or negligence. (*Seely*[, at p.] 18 . . . .) [¶] Since plaintiffs could not recover economic losses [i.e., the cost of repairing and replacing the defective windows], testimony on that item of damages would have been irrelevant.' (*Casey v. Overhead Door Corp.*, at p. 123.)" (*Aas v. Superior Court, supra,* 24 Cal.4th at pp. 640-641.)

Carrau's strict products liability theory does not entitle him to recover for the costs of repairing or replacing the defective windows. Apparently recognizing this, Carrau contends that the jury's award nonetheless is supported by the evidence that Marvin's product caused damage to Sheetrock, stucco, sills and other property. As discussed above, however, although Carrau produced evidence that effecting repairs to the windows would cause damage to Sheetrock, stucco and landscaping, the only evidence of actual property damage to property other than the windows provided by Marvin, is the evidence of "a couple of hundred dollars" worth of damage to Sheetrock and wallpaper. Carrau did not pay for the costs of repairing this damage. Rather, the persons who purchased his house paid it. Carrau did produce evidence that he repaired a window and replaced some wallpaper in 1993 or 1994, but he produced no evidence of the cost of those repairs. Carrau is not entitled to recover damages for expenses he did not incur and/or did not prove.

Carrau also cannot recover damages based on the diminution in value to the residence resulting from the installation of defective windows—a measure of damages that simply provides an alternative to the costs of repair and replacement, but does not somehow transform a contract or breach of warranty cause of action to a strict products liability cause of action. As was pointed out in the seminal case of *Seely v. White Motor Co., supra,* 63 Cal.2d 9, and many following cases, the distinction between economic damages in breach of warranty cases, and noneconomic damages in products liability cases, arises from the nature of the responsibility imposed on manufacturers. "A manufacturer may properly be held liable for physical injuries [or damage to property] caused by defects by requiring goods to match a standard of safety defined in terms of conditions that create unreasonable risks of harm. However, it cannot be held liable for the level of performance of products in the customer's business unless the manufacturer agreed that the product was designed to meet the customer's demands. A consumer should not be charged with bearing the risk of physical injury when a product is purchased, but can fairly be charged the risk that the product will not match economic expectations unless the manufacturer

agrees that it will." (*San Francisco Unified School Dist. v. W.R. Grace & Co.* (1995) 37 Cal.App.4th 1318, 1327-1328 [44 Cal.Rptr.2d 305], citing *Seely v. White Motor Co., supra,* 63 Cal.2d at p. 18.)

 Carrau's expectation was that the incorporation of Marvin's windows into his residence would increase the value of the residence, or, at least, that it would not decrease its value. When he sold the house at a diminished value, he lost "profits" on that sale as a result of the defective windows. In other words, when the value of his home was diminished by the use of Marvin's products, Carrau lost an economic benefit. He is not entitled to recover that benefit on a theory of products liability.

At least two other California cases have recognized that diminution in value is not available on a theory of noneconomic damages. In *San Francisco Unified School Dist v. W.R. Grace & Co., supra,* 37 Cal.App.4th 1318, the court noted that "the reduction of fair market value of buildings found to contain asbestos building materials may constitute an economic loss that cannot be recovered in tort in a strict liability or negligence action. Under the *Seely* analysis, no physical harm to persons or property has yet occurred—only economic losses." (*Id.* at p. 1327, fn. 5; and see *Stearman v. Centex Homes,* (2000) 78 Cal.App.4th 611, 620-621 [92 Cal.Rptr.2d 761], citing *W.R. Grace & Co.* with approval.) Similarly, the court in *Anthony v. Kelsey-Hayes Co.* (1972) 25 Cal.App.3d 442, 446 [102 Cal.Rptr. 113], denied the plaintiff, suing on a products liability theory, any depreciation in value to its trucks caused by defective wheels supplied by the manufacturer.[6]

As there is no evidence that Carrau suffered any noneconomic loss as a result of Marvin's defective product, there is no evidence justifying an award of noneconomic damages, except, perhaps for the cost of replacing wallpaper in 1993 or 1994. Carrau produced no evidence of that expense, and the jury's verdict clearly was not based on an estimate of that expense. In short, the award of damages for strict products liability is not supported by the evidence, and the jury's verdict, therefore, must be set aside.

## THE CROSS-APPEAL

 The court rejected certain instructions offered by Carrau on the Song-Beverly Act. It instead highlighted portions of an 11-page handbook available to litigants in small claims court, and instructed the jury on the act

---

[6]The only contrary authority is *Kriegler v. Eichler Homes, Inc.* (1969) 269 Cal.App.2d 224, 226-227 [74 Cal.Rptr. 749], where the court without analysis of the point sustained an award apparently based on the diminished value of a home resulting from a defective heating system. We find *San Francisco Unified School Dist v. W.R. Grace & Co.* and *Anthony v. Kelsey-Hayes Co.* to provide the more persuasive authority.

by giving it the highlighted handbook. The jury returned a verdict finding that Marvin had not violated the Song-Beverly Act. Carrau claims reversible instructional error.

Carrau correctly points out that the court failed to provide the jury with any oral instructions on the act, arguing that it follows that we must treat the situation as if the jury had been given no instruction whatsoever on the act. The authorities cited by Carrau for this proposition do not support it. Code of Civil Procedure section 608 is silent as to the necessity of providing the jury with oral instructions. The holding in *People v. Murillo* (1996) 47 Cal.App.4th 1104 [55 Cal.Rptr.2d 21], on which Carrau relies, is limited to the narrow set of facts presented there. The trial court in that case had instructed the jury orally with all relevant points of law, except that it accidentally had left out one standard instruction. This omission was discovered only after the jury had retired for deliberations. The court at that time refused to bring the jury back for further oral instructions, but did include the omitted instruction in a packet of written instructions provided to the jury. The appellate court found that it was not possible to determine if the jurors actually read the written copy of the instructions, and therefore held, "[W]e must assume that they did not, and approach the case as though the instruction was not given at all." (*Id.* at p. 1107.) In the present case, the court, although declining to read any portion of the handbook to the jury, made very specific reference to it, and directed the jury to consider it in connection with Carrau's claims of violation of the act. We therefore presume that the jury did in fact read the handbook.

There is, however, no question but that the court's actions were improper, and not only because it failed to provide oral instructions. A handbook, such as the court used here, is no substitution for concise, carefully drafted, jury instructions. The handbook includes material on many matters wholly unrelated to Carrau's claims, inviting confusion. In addition, the handbook contains passages from statutes and cases, and by providing it to the jurors the court suggested that they were to interpret and apply the law in addition to resolving factual issues. This was clear error.

The error, however, does not require reversal for the following reasons:

First, although Carrau submitted his own instructions, the record with which we have been provided contains nothing to indicate that he either expressly objected to the form of the instruction given by the court or that he offered a qualifying instruction. ■ "A failure to object to civil jury instructions will not be deemed a waiver where the instruction is prejudicially erroneous as given, that is, which is an incorrect statement of the law.

On the other hand, a jury instruction which is incomplete or too general must be accompanied by an objection or qualifying instruction to avoid the doctrine of waiver. [Citation.]" (*Bishop v. Hyundai Motor America* (1996) 44 Cal.App.4th 750, 760 [52 Cal.Rptr.2d 134].) ▮ The handbook contained extraneous matter, and undoubtedly was confusing, but it did not misstate the law. Carrau's failure to object or to seek a qualifying instruction waived the error.

Second, "[a] judgment may not be reversed for instructional error in a civil case 'unless, after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice.' (Cal. Const., art. VI, § 13.)" (*Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 580 [34 Cal.Rptr.2d 607, 882 P.2d 298].) The Song Beverly-Act sets forth various theories for creating warranties to accompany the sale of consumer goods, and states remedies for breach of those warranties. California Uniform Commercial Code section 2725 governs actions brought under the Song-Beverly Act. (*Krieger v. Nick Alexander Imports, Inc., supra*, 234 Cal.App.3d 205, 215.) We have already concluded that any action by Carrau for breach of warranty is time-barred under California Uniform Commercial Code section 2725. Carrau's claims under the act, therefore, also are time-barred, and the instructional error, accordingly, resulted in no miscarriage of justice.

CONCLUSION

The judgment is reversed. Marvin is awarded its costs on appeal.

Swager, J., and Marchiano, J., concurred.

The petition of plaintiffs and appellants for review by the Supreme Court was denied January 29, 2002.