Filed 7/22/14  SunCal La Quinta v. Eston CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

### IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

### FOURTH APPELLATE DISTRICT

### DIVISION THREE

| | |
|---|---|
| SUNCAL LA QUINTA, LLC, | |
| Plaintiff and Appellant, | G049494 |
| v. | (Super. Ct. No. INC057703) |
| JACQUELINE M. ESTON, as Co-Trustee, etc., et al., | O P I N I O N |
| Defendants and Appellants. | |

Appeal from a judgment of the Superior Court of Riverside County, John G. Evans, Judge.  Affirmed.

Nossaman, Robert S. McWhorter, Anthony A. Arostegui and Angela J. Clifford for Defendants and Appellants.

Miller Barondess, Louis R. Miller, Brian A. Procel and Mira Hashmall for Plaintiff and Appellant.

\*          \*          \*

Defendants Jacqueline M. Eston and Ulla Petersen, the daughter and wife respectively of Jesper Peterson (Peterson), deceased, and co-trustees of the Jesper Petersen Revocable Trust (Trust), appeal from a judgment entered after a jury found they had breached a contract to sell real property to plaintiff SunCal La Quinta. They contend the trial court erred in failing to find as a matter of law on summary judgment that plaintiff's payment to extend the escrow period was conditioned on new terms and finding instead that triable issues of material fact existed. We agree the issue was one of law but disagree defendants were thus entitled to judgment.

Defendants also argue the contract was void under the Subdivision Map Act (SMA), Gov. Code, §§ 66410 et seq., that the court erred in instructing the jury on option contracts, waiver, and imputed knowledge, and that the verdict form was defective. Plaintiff cross-appeals, asserting the court exceeded its authority in granting defendants' motion to vacate the judgment and enter a new judgment, eliminating the prejudgment interest it had previously awarded. (Code Civ. Proc., § 663; all further undesignated statutory references are to this code.) Finding no error, we affirm.

FACTS AND PROCEDURAL BACKGROUND

In July 2003, Golden Acre Farms, Inc. (Golden Acre) and Peterson, as trustee of the Trust, signed escrow instructions (contract) to sell 628 acres of undeveloped land to Regal Development, LLC (Regal) for $12.6 million. The contract designated Stewart Title of California, Inc. (Stewart Title) as the escrow holder.

Under the contract, the property was sold "'as is'" but Regal had until February 19, 2004 to conduct its due diligence. After that date, Regal could obtain two 12-month extensions by making nonrefundable payments of $200,000 each on or before

2

February 19, 2004 and 2005. No change was effective "unless given in writing by all the parties affected thereby."

Regal subsequently assigned its rights under the contract to SCC Acquisitions, Inc. (SCC), plaintiff's predecessor in interest. In early February 2004, SCC deposited $200,000 into escrow for a 12-month extension, with a letter from vice president of acquisitions Michael L. Canfield authorizing escrow officer Kathy Wenger to release those funds and the initial $10,000 deposit to the sellers on February 19.

But on February 19, Canfield wrote to Wenger, requesting she "hold" the deposit and extension payment pending further investigation into an environmental concern on the property. Later that day, he sent another letter to Wenger authorizing release of the funds based on SCC's "understanding" "from conversations between Regal . . . and the [s]ellers[,]" that, among other things, "[s]ellers will clean up the 55-gallon drums and the granular fertilizer" and "will be responsible for remediating the property prior to the close of escrow" "[i]n the event that remediation is required" (Canfield letter). Although the Canfield letter was addressed to Golden Acre and Peterson, Canfield only sent it to Wenger and Stewart Title never forwarded Canfield's letter to the sellers. The sellers cashed the $200,000 extension payment without knowledge of the letter.

In February 2005, after Peterson had died, SCC paid another $200,000 to extend the closing date. The parties also signed an amendment extending the deadline for closing escrow to February 19, 2006.

That December, defendants began demanding copies of Stewart Title's file regarding the escrow. After several requests, Stewart Title produced its entire file revealing the Canfield letter to defendants for the first time. Despite acknowledging receipt of the Canfield letter, neither the Trust's attorney, Kenneth Goodwin, nor defendants objected to it before the scheduled date for closing escrow.

3

On February 14, 2006, SCC assigned its interest under the contract to plaintiff and Canfield called Eston to confirm the closing date of February 19, 2006. The next day, Stewart Title forwarded proposed closing documents to Eston.

On February 23, Goodwin sent SCC's attorney, Bruce Cook, a letter listing reasons why defendants had not signed the documents. One was that the Canfield letter did not appear to have been sent to Petersen and "purports to be an amendment of the [contract] . . . relating to environmental issues . . . ." Because defendants did not know of any written amendment addressing that issue and believed the Trust owed no obligation in that regard, "[a]t a minimum clarification is required as to whether [plaintiff] believes the sellers have any ongoing responsibility for environmental remediation." Cook answered that he was unsure what Goodwin was referring to: "The [contract] is what [it] is. We are not proposing any changes to the obligations of the parties."

When Goodwin did not respond, Cook sent him another letter on March 16. Goodwin replied the next day, stating defendants' position remained the same as indicated in his February 23 letter. Escrow did not close.

Plaintiff sued defendants and Golden Acre for breach of contract and specific performance, but subsequently dismissed Golden Acre and the specific performance cause of action. Defendants moved for summary judgment on the grounds the contract violated the SMA and was unenforceable because the Canfield letter made plaintiff's acceptance conditional in that it contradicted the provision in the contract that the property was to be sold in an "as is" condition. The court denied the motion, stating, "The contract is not void [under the SMA] . . . [b]ecause . . . [t]he [contract] here deals with the full 628 acres. There are tr[ia]ble issues of fact as to whether the $200[,]000.00 tender was unconditional[,] thereby effectively extending escrow beyond 2/19/04." It also denied two motions for judgment on the pleadings made on the ground the contract was void because it violated the SMA.

The jury returned a special verdict finding that the parties had entered a contract, plaintiff had done everything required by the contract, all conditions necessary for defendants' performance occurred, defendants failed to comply with a requirement under the contract, which caused harm to plaintiff in the amount of approximately $4.7 million. Although the court originally entered a judgment including an award of prejudgment interest, it later granted defendants' motion to vacate and correct the judgment and entered a modified judgment eliminating the prejudgment interest.

## DISCUSSION

### 1. Defendants' Appeal

#### a. Failure to Find Plaintiff's Acceptance was Conditional

Defendants argue the court erred by finding triable issues of material fact existed regarding whether the February 19, 2004 extension payment was conditional and ineffective to extend what they assert was an option contract for another year. According to them, the issue was one of law because it could be determined based on the words of the Canfield letter, the contract, and undisputed extrinsic evidence. We agree but conclude plaintiff's acceptance was *not* conditional as a matter of law.

For purposes of this discussion, we shall assume without deciding the escrow instructions constituted an option contract. "'An option is an offer by which a promisor binds himself in advance to make a contract if the optionee accepts upon the terms and within the time designated in the option.'" (*Corrie v. Soloway* (2013) 216 Cal.App.4th 436, 444.) It "'is transformed into a contract of purchase and sale when there is an unconditional, unqualified acceptance by the optionee of the offer in harmony with the terms of the option and within the time span of the option contract.'" (*Steiner v. Thexton* (2010) 48 Cal.4th 411, 420.) "[W]hen the provisions of an option contract

5

prescribe the particular manner in which the option is to be exercised, they must be strictly followed." (*Palo Alto Town & Country Village, Inc. v. BBTC Company* (1974) 11 Cal.3d 494, 498.) "[T]ender of money is such acceptance of an option-offer as will create an enforceable contract." (*State of Californiav. Agostini* (1956) 139 Cal.App.2d 909, 913.)

"Mutual consent necessary to the formation of a contract 'is determined under an objective standard applied to the outward manifestations or expressions of the parties, i.e., the reasonable meaning of their words and acts, and not their unexpressed intentions or understandings. [Citation.]' [Citations.] Although mutual consent is a question of fact, whether a certain or undisputed state of facts establishes a contract is a question of law for the court." (*DeLeon v. Verizon Wireless, LLC* (2012) 207 Cal.App.4th 800, 813.)

Here, it is undisputed that plaintiff timely made the $200,000 option payment on February 19, 2004. Rather, the question is whether that payment was unconditionally made to extend the time period for conducting due diligence for another year or whether the Canfield letter was a counteroffer, which resulted in the contract expiring on February 19, 2004. We conclude the payment was unconditional.

First, the Canfield letter was not a counteroffer. In *Cates v. McNeil* (1915) 169 Cal. 697 (*Cates*), the lessee-optionee served a written notice on the lessor-optionor attempting to exercise an option to purchase the real property. The first sentence of the notice stated unequivocally the optionee's desire to exercise the option. The second paragraph of the notice contained a "demand" that the optionor have prepared a "'certificate of title'" and a deed conveying the land "'free from all encumbrance'" and deposit the certificate and deed into escrow. (*Id*. at pp. 700-701.) The optionor claimed this notice was not a valid exercise of the option because the "attempted acceptance was accompanied by conditions [the certificate and deed] . . . [that] were not required or

6

provided for in the option contract to be done by the lessor or the appellants as successors in interest, and that a demand for their performance accompanying the notice of acceptance as part thereof rendered the acceptance ineffectual." (*Id*. at p. 704.)

*Cates* rejected the optionor's contention that the notice was not a valid exercise of the option. It concluded that the optionee's "unwarranted" demands "had reference solely to the performance of the contract, the manner in which it should be carried out after it was created by the acceptance which was made." (*Cates*, *supra*, 169 Cal. at p. 704.) "The opening paragraph of the notice to [the optionor] was an absolute and unqualified acceptance of the right of option according to its terms. The subsequent paragraph referring to furnishing a certificate of title and the matter of the escrow contains no language imposing the doing of these things as a condition to the acceptance. It is a paragraph wholly disconnected with the previous paragraph declaring an acceptance in clear and unqualified language and does not in terms or by necessary intendment impose any conditions as to the acceptance of the option. It does not say that the option is accepted 'on condition' or 'provided' these things shall be done. It has reference to something that is to be done and necessarily would have to be done after the acceptance in the previous paragraph is declared made . . . . The acceptance by respondents unconditionally made in the first paragraph of the notice having converted the option right into an executory contract of sale and purchase of the leased premises, the second paragraph was not intended to have any relation to such acceptance nor to render such acceptance in any particular conditional or qualified." (*Id*. at pp. 704-705.)

Likewise, here, based on an objective standard, the $200,000 option payment qualified as "an absolute and unqualified acceptance" of the option to extend the escrow for another year. (*Cates*, *supra*, 169 Cal. at p. 704.) The Canfield letter was not stated as a condition to the acceptance and related only to the performance of the purchase transaction after acceptance. The optionee in *Cates* sought to require that an

7

unencumbered deed and a certificate of title be deposited into escrow. Plaintiff in this case did not seek to require defendants to do anything. Rather, Canfield authorized release of the funds "[b]ased on" his "understanding" of what sellers agreed to do. A comment on the terms of the offer generally is not a counteroffer. (Rest.2d Contracts, § 39, com. b, p. 106.) And because the Canfield letter was not delivered to defendants along with plaintiff's acceptance of the option to extend, Canfield's understanding that was never communicated to Peterson had no bearing on the validity of the acceptance. Moreover, like the deposit of documents into escrow in *Cates*, the Canfield letter did not aim to alter the *terms* of the purchase transaction but only to impact the *performance* of the purchase agreement. We are bound by *Cates* (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455) and conclude it controls here.

*Landberg v. Landberg* (1972) 24 Cal.App.3d 742, cited by defendants, does not persuade us otherwise. There, the offer was explicitly premised on three specific conditions. The purported acceptance explicitly accepted one of the conditions and explicitly rejected the other two. The court concluded that the purported acceptance was a counteroffer rather than an acceptance because it sought to vary the terms of the offer. (*Id*. at pp. 754-757.) *Landberg* is not applicable because the Canfield letter did not reject any express condition of the option.

Second, and perhaps more important, even assuming the Canfield letter was a counteroffer, it was never communicated to defendants until after the second $200,000 was paid to extend the escrow to February 19, 2006. Generally "'an unequivocal rejection by an offeree, *communicated* to the offeror, terminates the offer[,]' . . . [as may] a manifestation of an intent not to accept, short of an unequivocal rejection . . . . [Citation.] If the offeree's words or acts either indicate that the offeree is declining the offer or justify the offeror in so inferring, the offeree will be considered to have rejected the offer." (*Guzman v. Visalia Community Bank* (1999) 71 Cal.App.4th 1370, 1376,

8

italics added.) "[A] counteroffer that deviates from the terms of an offer ordinarily operates as a rejection of the offer so as to terminate the offer immediately." (*Martinez v. Brownco Construction. Co., Inc*. (2013) 56 Cal.4th 1014, 1020.)

The issue then becomes whether plaintiff communicated its acceptance of the option to extend before defendants received the purported counteroffer contained in the Canfield letter. The undisputed evidence demonstrates plaintiff accepted the option to extend before defendants had any knowledge of the Canfield letter.

In *Ersa Grae Corp. v. Fluor Corp*. (1991) 1 Cal.App.4th 613, a prospective purchaser of real property (Ersa Grae) sued the seller (Fluor) for breach of contract. Fluor defended in part by contending its offers had been revoked before Ersa accepted them. Specifically, Fluor contended "its notice of revocation was effective immediately upon its communication to Horne [a commercial real estate brokerage firm] without regard to whether Horne was Ersa Grae's agent and without regard to whether that notice was subsequently related to Ersa Grae." (*Id*. at p. 622.) Rejecting that claim, the court noted, "If Horne was Ersa Grae's agent, Fluor's notice to Horne of Fluor's revocation of its counteroffer would have been effective as a direct notice to someone authorized on behalf of the offeree to accept such notice. [Citation.] Similarly, if Horne (even though it was not Ersa Grae's agent) had relayed Fluor's notice of revocation to Ersa Grae, actual notice of revocation would also have been effective. (1 Witkin, Summary of Cal. Law (9th ed. 1987) Contracts, § 170, p. 186 [indirect notice from a reasonable source indicating to the offeree that the offeror has revoked its offer is effective]; see also Rest.2d Contracts, § 43.)" (*Ibid*.) The court deemed these rules irrelevant because the jury had rendered "special verdicts finding no agency and no actual notice." (*Ibid.*)

The rules are similarly inapplicable here because (1) the uncontroverted facts show, and defendants admit, they "did not know of [the] existence" of the Canfield letter until after plaintiff communicated its acceptance of the second extension and (2)

9

"Stewart Title had no authority to act on behalf of, or bind, the[m]" so its "knowledge should not be imputed to the[m]."

Defendants acknowledge the rules regarding the limited nature of an escrow agency. Under those rules, although "[a]n escrow holder is an agent and fiduciary of the parties to the escrow[,] . . . [t]he agency created by the escrow is limited . . . to the obligation of the escrow holder to carry out the instructions of each of the parties to the escrow." (*Summit Financial Holdings, Ltd. v. Continental Lawyers Title Co*. (2002) 27 Cal.4th 705, 711.) According to defendants, "Stewart Title has maintained that it had no duty to disclose the Canfield [l]etter based on [a] . . . provision in the [contract] . . . , which provided that '[Stewart Title] shall have no responsibility for notifying any of the parties to this escrow of any . . . transaction involving any property herein described," and that nothing in the contract "compelled it to make such a disclosure or authorized it to accept the Canfield [l]etter on [defendants'] behalf."

Defendants analogize this case to *Janssen v. Gordon* (1939) 35 Cal.App.2d 410, in which a real estate agent (St. Germaine) "acted as [the] agent for and received commissions from both . . . parties" to the real estate transaction. (*Id*. at p. 412.) There, Janssen offered to sell real property to Brandt. Upon receiving the offer, Janssen, in St. Germaine's presence, wrote a counteroffer and instructed St. Germaine to have Brandt initial it if she agreed but the agent never did so. The changed offer was never submitted to Brandt and she never knew of it until the time of trial. The court held, "The fact that St. Germain was acting in a dual capacity as agent for both parties, and that he knew of the change made by Janssen in the offer, cannot serve to charge . . . Brandt with such knowledge. In transmitting the counteroffer of Janssen to the Brandts, St. Germain was clearly acting as the agent of Janssen. Janssen cannot take advantage of the failure of the agent to disclose the change made by him to the Brandts." (*Id.* at p. 413.) Since defendants ask us to follow *Janssen* and not impute any knowledge of the Canfield letter

10

to them because Stewart Title was not their agent, that means it remains undisputed that defendants did not receive the Canfield letter purporting to reject the terms of the contract until long after plaintiff had already indicated its acceptance.

Given our conclusion, it is unnecessary to address defendants' claim they did not waive their "right to enforce strict compliance with the option" for an unconditional payment of $200,000 to extend the escrow closing date.

### b. *SMA*

Defendants contend the contract was void because it violated the SMA. We disagree. Having reviewed de novo the "application of statutory language to . . . undisputed facts" (*Trujillo v. North County Transit Dist.* (1998) 63 Cal.App.4th 280, 284), we conclude the contract did not violate the SMA as a matter of law.

"The [SMA] is '"the primary regulatory control" governing the *subdivision* of real property in California. [Citation.] . . .' [¶] 'As used in the Act, "subdivision" means "the division, by any subdivider, of any unit or units of improved or unimproved land . . . ."'" (*Tower Lane Properties v. City of Los Angeles* (2014) 224 Cal.App.4th 262, 269, italics added.) Its "three principal goals[ are] to encourage orderly community development, to prevent undue burdens on the public, and to protect individual real estate buyers." (*van't Rood v. County of Santa Clara* (2003) 113 Cal.App.4th 549, 563-564.) Thus, it "generally prohibits the sale, lease, or financing of *any parcel of a subdivision* until the recordation of an approved map in full compliance with the law." (*Gardner v. County of Sonoma* (2003) 29 Cal.4th 990, 999, italics added.)

Under Government Code section 66499.30, subdivisions (a) and (b), "No person shall sell, lease, or finance any parcel or parcels of real property . . . *for which a final [or parcel] map is required by this division or local ordinance*, until the final [or parcel] map thereof in full compliance with this division and any local ordinance has

11

been filed for record by the recorder of the county in which any portion of the subdivision is located." (Italics added.) "A final (subdivision) map is generally required for subdivisions of five or more parcels. [Citations.] A parcel map is generally required for the creation of four or fewer parcels. [Citations.] Subdivided lands may not be legally sold, leased, or financed without the required approval and map." (*van't Rood v. County of Santa Clara*, *supra*, 113 Cal.App.4th at pp. 564-565.)

The SMA does not apply to contracts for the purchase of an entire property. (See *Corrie v. Soloway*, *supra*, 216 Cal.App.4th at pp. 444-445.) Rather, it "clearly is designed to restrict activities of the subdivider – – the one 'who causes land to be divided into a subdivision' [citation]. Its prohibitions [citation] and its penal sanctions [citation] run only to the affirmative act of selling or offering for sale, and not to purchase." (*Keizer v. Adams* (1970) 2 Cal.3d 976, 979-980.)

Here, the contract called for the sale of the *entire* property consisting of 628.74 acres. It did not involve the subdivision of the property into parcels, or the purchase of a subdivision or parcel of property, and thus did not require either a final or parcel map, making the SMA inapplicable.

The cases on which defendants primarily rely are inapposite because the agreements in those cases were for the sale of *parcels* of real property, requiring a parcel map to be recorded before the parties entered the agreements. (See *Sixells, LLC v. Cannery Business Park* (2008) 170 Cal.App.4th 648, 653-654 [contract to purchase "four acres of unsubdivided land"]; *Black Hills Investments, Inc. v. Albertson's, Inc.* (2007) 146 Cal.App.4th 883, 886-887, 893 [contracts to buy "two parcels of then unsubdivided real property"] (*Black Hills*).) Here, in contrast, the contract was not for parcels of the 628.74 acres but for the entire property and the SMA is thus inapplicable.

Defendants maintain the contract "specifically permitted multiple partial releases and reconveyances" that "are required to be in 40-acre increments . . . ." They

cite a clause in the contract involving "SELLER FINANCING," which provides, in part, "Note and Deed of Trust to provide for releases in 40 acre minimums at $20,000.00 per acre.  Location of releases shall be mutually agreed upon.  40 acres shall be released in return for the down payment in a location to be mutually agreed upon.  If the location cannot be mutually agreed upon no releases shall be made."  Defendants also note the Rider to Short Form Deed of Trust and Assignment of Rents (rider), which also provides for "partial reconveyances of the Deed of Trust with respect to portions of the Property of at least 40 acres for each partial reconveyance, with such partial reconveyances of the Property to be of mutually agreeable locations of the property . . . ."

Defendants acknowledge that any agreement to release property was to be made "at a later time."  But if and when the releases occur, and no final or parcel map is filed at that time in compliance with the SMA, Government Code section 66499.32, subdivision (a) gives plaintiff the option of voiding the agreement.  That statute provides, "Any deed of conveyance, sale or contract to sell real property which has been divided, or which has resulted from a division, in violation of the provisions of this division, or of the provisions of local ordinances enacted pursuant to this division, is *voidable at the sole option of the grantee, buyer or person contracting to purchase* . . . ."  Thus, if and when any agreement to release certain parcels of property was ever made, *plaintiff*, as the buyer, would have the option of voiding the sale if the property was divided without compliance with the SMA.  (*Le Gault v. Erickson* (1999) 70 Cal.App.4th 369, 374.)

In *Black Hills*, the court held Government Code section 66499.32 was inapplicable because it "expressly applies to a contract to sell real property that 'has been divided, or which has resulted from a division, in violation of [the SMA]' (§ 66499.32, subd. (a)), and the contracts at issue here were for the sale of real property that had not yet been subdivided, thereby rendering the sale a violation of the prohibition set forth in section 66499.30[, subdivision] (b)."  (*Black Hills*, *supra*, 146 Cal.App.4th at p. 887.)

13

But unlike here, *Black Hills* did not involve an issue involving a potential release of property in the future.

And because any potential release is to be in the future, the claim is not yet ripe for adjudication. "'The ripeness requirement, a branch of the doctrine of justiciability, prevents courts from issuing purely advisory opinions.'" (*Vandermost v. Bowen* (2012) 53 Cal.4th 421, 452.) "'[A] controversy is "ripe" when it has reached . . . the point that the facts have sufficiently congealed to permit an intelligent and useful decision to be made.'" (*Ibid.*) Here, the decision to release a particular 40 acres may never become ripe given the language in both the contract and the rider specifically stating no releases can be made if the parties cannot agree on a location. Because those provisions gave defendants "discretion not to make releases," we reject their claim to the contrary. And until the parties agree on a precise location, no final or parcel map can be made or approved. If and when that occurs, the parties may be required to enter a new contract after filing a final or parcel map or "expressly condition[ing the contract] upon the approval and filing of a final subdivision map or parcel map, as required under" Government Code section 66499.30, subdivision (e).

Given our conclusion, we need not address defendants' arguments the provisions in violation of the SMA could not be severed and that policy reasons require the SMA be enforced.

### c. Instructional Error

Defendants assert the court committed reversible error in instructing the jury on option contracts, waiver, and imputed knowledge. Defendants acknowledge they did not object to the instructions but argue "'"[a] failure to object to civil jury instructions will not be deemed a waiver where the instruction is prejudicially erroneous as given, that is, which is an incorrect statement of the law."'" (*Bowman v. Wyatt* (2010) 186

14

Cal.App.4th 286, 298, fn. 7.)  However, "'a jury instruction which is incomplete or too general must be accompanied by an objection or qualifying instruction to avoid the doctrine of waiver.'"  (*Carrau v. Marvin Lumber & Cedar Co*. (2001) 93 Cal.App.4th 281, 297.)

Defendants contend the "jury instructions regarding option contracts" did not include the requirement of "strict compliance," the waiver instruction "ignore[d] law stating that inaction does not constitute assent unless there is a prior course of dealing between the parties which place the offeree under a duty to be bound," and the instructions on imputed knowledge "were too generalized and fail[ed] to recognize the vast legal difference between general agency and an escrow agency."  Because these are all claims the instructions were "'incomplete or too general,'" defendants' failure to object to them forfeits the issues on appeal.  (*Carrau v. Marvin Lumber & Cedar Co*., *supra*, 93 Cal.App.4th at p. 297.)

### d.  Special Verdict Form

Defendants' final argument is that the special verdict form was "fatally defective" because "it oversimplified the contract issue to mislead the jury by simply asking if the parties entered into a contract" and did not include other "disputed issues" such as whether plaintiff's exercise of the extension option was conditional or a counteroffer and whether Stewart Title's knowledge could be imputed to defendants. Defendants concede they did not object to the special verdict form.  A party who fails to object to a special verdict form ordinarily forfeits any objection to the form.  (*Behr v. Redmond* (2011) 193 Cal.App.4th 517, 530; *Jensen v. BMW of North America, Inc.* (1995) 35 Cal.App.4th 112, 130-131.)

Defendants maintain they did not forfeit their contention because "'the record indicates that the failure to object was not the result of a desire to reap a "technical

15

advantage" or engage in a "litigious strategy."''" (*Behr v. Redmond*, *supra*, 193 Cal.App.4th at p. 530.) Even if so, they were the ones claiming the special verdict form was "oversimplified" and should have contained additional questions. It was thus their responsibility to ensure those findings "were included in the verdict." (*Ibid*.; see *Heppler v. J.M. Peters Co*. (1999) 73 Cal.App.4th 1265, 1287 [claim that special verdict form did not adequately address the defendant's negligence held forfeited when the plaintiffs failed to submit special verdict form addressing alleged negligence]; Cal. Rules of Court, rule 3.1580 [party requesting special findings by jury must "present to the judge in writing the issues or questions of fact on which the findings are requested"].) Their failure to do so forfeits any error to the form of the special verdict.

## 2. *Plaintiff's Cross-Appeal*

Plaintiff's cross-appeal contends the court erred in granting defendants' motion to vacate the judgment granting prejudgment interest and entering an amended judgment eliminating it. We disagree.

### *a. Procedural Background*

After the jury returned its verdict, plaintiff submitted and served a proposed judgment, indicating in part that it "shall recover . . . pre[]judgment interest pursuant to . . . Civil Code section 3289[, subdivision] (b) at the rate of . . . 10%[] per annum for total interest of $[2.4 million] from [the date defendants breach the contract] through [the date the special verdict was filed]; plus pre[]judgment interest of [over $1,000] per day from April 13, 2011 until the date of entry of this judgment . . . ." The next day, defendants filed an objection to the proposed judgment on the ground that plaintiff was not entitled to prejudgment interest under Civil Code section 3287, subdivision (a) as a matter of law because the damages were not readily ascertainable.

16

Five days later, plaintiff filed a motion for prejudgment interest under Civil Code sections 3287, subdivision (b), 3289, subdivision (a) and 3306 (authorizing interest as part of the damages for "breach of an agreement to convey an estate in real property"). Attached to the motion was a modified proposed judgment awarding plaintiff interest under those statutes and "reflect[ing] interest [in the total amount of [$2.3 million] running from . . . (the date the [c]omplaint was filed in this action) until . . . (the date of filing of the [m]odified . . . [j]udgment[)]." According to plaintiff, the modification was submitted to comply with Civil Code section 3287, subdivision (b)'s requirement that prejudgment interest on an unliquidated claim may not begin any earlier than the date the complaint was filed.

Although plaintiff's motion for prejudgment interest was set for hearing at the end of May, the court signed the *original* proposed judgment on May 6, after reducing the interest by approximately $650 for the period between the date defendants breached the contract through the filing of the special verdict and the daily interest after that by less than a dollar. Unaware that judgment had been entered, defendants filed an opposition to the motion for prejudgment interest five days after the court entered judgment. They contended Civil Code section 3306 did not provide an independent basis for awarding interest, but only gave the court the same discretion it had under Civil Code section 3287, subdivision (b), which defendants argued should be exercised against awarding prejudgment interest because the "case involve[d] a number of bona fide and complicated issues." About two weeks later, the court informed defendants it had not considered their objection to the proposed judgment at the time it signed the judgment.

Defendants moved to vacate the judgment under section 663, arguing, among other things, that the court's inadvertent failure to review or consider their objection or opposition before entering judgment meant it had not exercised its discretion under Civil Code section 3287, subdivision (b) and that any prejudgment interest

17

awarded must run from the filing of the complaint rather than from the date of the alleged breach.  Plaintiff agreed with defendants' last contention.

The court granted the motion to vacate, stating, "I had kept the judgment on my desk for . . . quite some time and was not informed that any type of objection or motion had in fact been filed before I signed it.  I did not exercise any discretion at all.  I simply made my own interest calculation and inserted those numbers in this judgment before I signed it.  So my intention is to grant that motion to vacate and/or correct the judgment until such time as I exercise appropriate discretion before making that decision."  Subsequently, the court entered an amended judgment eliminating the award of prejudgment interest "nunc pro tunc as of May 6, 2011."

### b. Discussion

Plaintiff contends the amended judgment was void because the court exceeded its jurisdiction under section 663.  We need not address the issue as presented because as plaintiff admitted during oral argument, defendants could have pursued an appeal from the original award of prejudgment interest.  In that event, we would have reversed the award of prejudgment interest given the court's admission it had not exercised any discretion in the initial ruling and remanded the matter with instructions to the court to do so.

In *Axe v. Commercial Credit Corp.* (1964) 227 Cal.App.2d 216 (*Axe*), the court rejected the plaintiff's argument "that the trial court lacked jurisdiction to amend the judgment changing the interest date" under section 663 and the only basis for doing so was section 662, stating "the original judgment was in error in computing interest from the date of levy of the writ of garnishment.  Had no correction been made in the trial court, the error (having been timely called to the attention of the trial court) would have been corrected in this court on the appeal from the judgment.  [Citation.]  Since the

18

judgment as purportedly modified by the trial court is the same as we would have directed without such modification below, the issue is now moot." (*Id*. at p. 225.)

Although *Axe* involved only the date for which prejudgment interest may be awarded, the same analysis pertains here. The parties agree that to the extent plaintiff is entitled to prejudgment interest, it would be under Civil Code section 3287, subdivision (b), which gives trial judges discretion to award prejudgment interest from the filing of suit or a later date. (*North Oakland Medical Clinic v. Rogers* (1998) 65 Cal.App.4th 824, 828-829.) But "[f]ailure to exercise discretion is itself an abuse of discretion." (*Austin v. Valverde* (2012) 211 Cal.App.4th 546, 550; *In re Marriage of Gray* (2007) 155 Cal.App.4th 504, 515.) Thus, had the trial court not vacated the original judgment, we would have reversed the original judgment, if asked, and remanded the matter with instructions for the court to do so. As in *Axe*, this is no longer an issue because having now exercised its discretion, the court declined to award any prejudgment interest to plaintiff and the only remaining question is whether that decision was an abuse of the court's discretion.

Appellate courts will disturb discretionary trial court rulings only upon a showing of "'a clear case of abuse'" and "'a miscarriage of justice.'" (*Blank v. Kirwan* (1985) 39 Cal.3d 311, 331; *Denham v. Superior Court* (1970) 2 Cal.3d 557, 566.) "'The appropriate test for abuse of discretion is whether the trial court exceeded the bounds of reason. When two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court.'" (*In re Stephanie M*. (1994) 7 Cal.4th 295, 318-319.) "The burden is on the party complaining to establish an abuse of discretion, and unless a clear case of abuse is shown and unless there has been a miscarriage of justice a reviewing court will not substitute its opinion and thereby divest the trial court of its discretionary power." (*Denham v. Superior Court*, *supra*, 2 Cal.3d at p. 566.)

19

Here, as the party challenging the order vacating the original judgment and entering an amended one, it was plaintiff's burden to show the court abused its discretion in eliminating the award of prejudgment interest.  Instead of doing so, plaintiff merely asserts the *original* award of prejudgment interest was a proper exercise of discretion and states several reasons in support.  Plaintiff thus failed to carry its burden on appeal

DISPOSITION

The judgment is affirmed.  The parties are to bear their own costs.

RYLAARSDAM, ACTING P. J.

WE CONCUR:

BEDSWORTH, J.

MOORE, J.

20